IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CHERRY LATHAM,

                  Plaintiff,           Civil Action No.
                                            1:06-CV-1511 (GLS/DEP)

    vs.

COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

ERWIN, McCANE & DALY       THOMAS C. ERWIN, ESQ.
23 Elk Street
Albany, New York 12207

FOR DEFENDANT:

HON. ANDREW T. BAXTER     MARGARET A. DONAGHY, ESQ.
United States Attorney for the    Special Assistant U.S. Attorney
Northern District of New York
Post Office Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

OFFICE OF GENERAL COUNSEL   BARBARA L. SPIVAK, ESQ.
Social Security Administration   Chief Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Cherry Latham, who suffers from various diagnosed physical and mental conditions including migraine headaches, the residual affects of a minor stroke, hypertension, obesity and depression, commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her application for supplemental security income ("SSI") benefits under the Social Security Act ("Act").  In support of her challenge, plaintiff contends that the administrative law judge ("ALJ") assigned to hear and determine the matter improperly discounted her testimony regarding the non-exertional limitations caused by her conditions as not being fully credible, and erroneously determined that she retains the requisite residual functional capacity ("RFC") to perform work available in the national and regional economies.

Having carefully reviewed the record in this case, in the light of plaintiff's arguments, I conclude that the Commissioner's determination resulted from the application of proper legal principles and is adequately supported by substantial evidence.  Accordingly, I recommend dismissal of plaintiff's complaint.

I.   BACKGROUND

Plaintiff was born in 1967, and was thirty-eight years old at the time of issuance of the decision denying her application for benefits. Administrative Transcript at pp. 29, 100, 365.[1]  Plaintiff is divorced, and lives with five children in a home located in Averill Park, Rensselaer County, New York.[2]   AT 101, 141, 347, 366, 373.  Plaintiff has only a ninth grade education, having been placed in special education classes while in school, and has not obtained a general equivalency diploma.  AT 127, 348, 366, 368.

Over the years since leaving school, plaintiff has had only a modest work history.  Several of plaintiff's work experiences involved employment at fast food restaurants.  *See, e.g.* AT 152, 350, 366-67.   Plaintiff also worked in a warehouse for four or five months in 2000, filling five-gallon buckets with driveway/pavement sealer and loading them onto pallets, AT 122, 348-49, 366, 374, and as a dietician aide at Rosewood Gardens in

---

[1]     Portions of the administrative transcript, Dkt. No. 6, compiled by the Commissioner and consisting in large part of the medical records and other evidence that was before the agency when its decision was made, will be cited herein as "AT ___."

[2]     It is unclear from the record how many children plaintiff actually has. While Ms. Latham testified that she lives with five children, including her godson, ranging in age from three to fifteen, *see* AT 347, she also stated that she receives child support and welfare points for her two children.  *See* AT 348.

1998, AT 152.  In addition, Ms. Latham has worked at a variety of jobs for

durations of one week or less, including as a delicatessen server at

Hannaford Market for a weekend in 2003, AT 101, 122, 152, 349; in

farming at the Old Chatham Sheepherding Company for two days in

2002,[3] AT 107, 152; as a cashier at the Jiffy Mart for one week in 2000,

AT 152; and as a custodian at River Park School for one week.  AT 350.

Plaintiff has identified several conditions, including chronic and

severe migraine headaches, hypertension, depression, severe mood

swings and two strokes, as the basis for her inability to work, explaining

that her illnesses disrupt her normal work schedule and require her to

frequently call in sick.  AT 121.  Addressing her migraine headaches,

plaintiff states that they can typically occur up to four times per month, and

generally last up to two days.  AT 359.  To cope with her headaches,

plaintiff is required to retreat to a darkened room or to seek emergency

treatment at a hospital.[4]  *Id.*  Plaintiff takes twelve pills per day to control

─────────────────

[3]     While plaintiff testified that she worked at the sheep farm for two years,
*see* AT 350, the record convincingly demonstrates that the position lasted only for two
days.  *See, e.g.,* AT 122.

[4]     Plaintiff's testimony regarding the frequency of her headaches was
inconsistent.  While testifying on one occasion to experiencing migraine headaches
approximately four times per month, at another point during the hearing she stated that
they occur twice monthly, and only last one day.  AT 368-69.

her headaches; the medication, however, tends to cause her to experience fatigue.  AT 369.

Plaintiff also states that her depression is another major cause of her inability to work.  Plaintiff testified that she feels depressed, causing her to cry, scream at people, and feel jittery, uncomfortable and generally anti-social around people.  AT 356, 359, 370.  Plaintiff's depression caused her to attempt suicide in 1998, resulting in hospitalization for one month at the Albany Medical Center.  AT 354.  Plaintiff also claims that in March of 2004 she underwent emergency treatment at Albany Memorial Hospital on three separate occasions for her symptoms of depression.[5] AT 354-55.

Addressing her strokes, plaintiff testified that she had one such event in 2000, and another in 2002 or 2003, initially causing some temporary paralysis in the right side of her face.  AT 351-52.  Plaintiff stated that those strokes also resulted in weakness in her right arm,

_____

[5]   Plaintiff's medical records do not fully substantiate this claim.  While the record does reveal an emergency room visit on March 29, 2004, plaintiff's complaints at that time were recorded as including chest pain and a headache.  AT 264-66.  The diagnosis made at that time was of migraine headaches and anxiety disorder/panic attack, with no mention of depression.  AT 265.  The only other documented emergency room visit in the March, 2004 timeframe came on February 28, 2004, and was based upon complaints of shortness of breath and numbness in plaintiff's left arm.  AT 261-62.

rendering it useless for about an hour once each month.  AT 352.

The effects of plaintiff's strokes were the subject of evaluation on January 5, 2003 by Dr. Clifford Erickson at Albany Memorial Hospital where plaintiff presented with complaints of left arm numbness.  AT 170-87.  Dr. Erickson noted stable vital signs and normal gait, and that her EKG revealed left ventricular hypertrophy, mild left axis deviation, normal intervals and no acute ischemic changes, while her complete blood count ("CBC") test was "entirely within normal limits."  AT 170.  Dr. Erickson's diagnosis was a cerebrovascular accident with left deltoid weakness.  AT 171.

The following day Dr. James Wymer, a neurologist, also evaluated plaintiff's left arm weakness.  AT 179-81.  Dr. Wymer noted that the results of a computed tomography ("CT") scan of plaintiff's head was within normal limits; magnetic resonance imaging ("MRI") testing revealed no acute findings; a carotid ultrasound showed no hemodynamically significant stenosis; and an EKG found normal sinus rhythm.  AT 181.  In detailing plaintiff's past medical history, Dr. Wymer noted that she reported having as many as twelve migraine headaches per month.  AT 179-81, 188.

6

Plaintiff's migraine headaches have been treated by a variety of healthcare providers.   On May 25, 2003, plaintiff presented to the Albany Memorial Hospital Emergency room, complaining of headaches.  AT 235-36.  Plaintiff was referred to Dr. Christopher Calder, who conducted a neurological examination on the following day.  AT 237-38.  In a report of his examination, Dr. Calder noted difficulty in obtaining plaintiff's medical history and that she appeared unsure of how many headaches were experienced on a monthly basis, surmising that the number approximated twelve.  *Id.*  Dr. Calder recorded that plaintiff was extensively medicated, rendering her unfit for any higher function neurological testing.  *Id.*  The doctor opined that plaintiff appeared to have an "intractable headache which could potentially be due to be migraine and/or transform migraine in relationship to her nonsteroidal usage."  AT 238.  Dr. Calder also posited a pseudotumor or viral meningitis as other possible causes of her headache.  AT 237-38.

On June 14, 2003, plaintiff again sought treatment from the emergency room at Albany Memorial Hospital, complaining of a migraine headache and describing associated blurred vision, photosensitivity and nausea with vomiting.  AT 211-13.  Dr. Peter Sosnow evaluated plaintiff

7

on that occasion, and found that she was photosensitive, her heart was regular, and her gait and coordination were normal.  AT 244.  Dr. Stephen Hassett also assessed plaintiff on that occasion, noting that she claimed her headache would subside and return, and that she asked for narcotics.  AT 243.  Dr. Hassett discharged plaintiff with a diagnosis of a migraine headache and a prescription for Lortab.[6]  AT 243.

On September 9, 2003, plaintiff presented once again at the Albany Memorial Hospital emergency room complaining of a migraine headache, accompanied by nausea and vomiting, and was treated intravenously with morphine and Anzemet.[7]  AT 246-49.  After examining plaintiff, Dr. Mary Colfer noted that her vital signs were stable and within normal limits, and that her gait was normal.  AT 248.  Dr. Colfer discharged Ms. Latham that same day after prescribing Lortab.  AT 248-49.

On October 6, 2003, Dr. Laximkant Bhoiwala treated plaintiff for a headache and complaints of occasional nausea.  AT 273.  Dr. Bhoiwala noted that the headaches had lasted a few days, and that plaintiff''s

---

[6]     Lortab is a combination preparation of hydrocodone barbiturate, a semisynthetic opioid analgesic derived from codeine, and acetaminophen.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 890, 1090 (31st ed. 2007).

[7]     Anzemet is a preparation of dolasetron mesylate used in the prevention of nausea and vomiting.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 113, 568 (31st ed. 2007).

prescription medications Neurontin[8] and Topamax[9] had not provided relief.

*Id.*  Dr. Bhoiwala diagnosed plaintiff as suffering from uncontrolled

hypertension, morbid obesity and severe headaches secondary to

migraine and hypertension.  *Id.*

Plaintiff returned to Albany Medical Hospital on October 7, 2003 with

further complaints of a migraine headache, and was admitted as an

inpatient.  AT 250-51.  The following day Dr. Wymer treated Ms. Latham

for migraine headaches, noting that a friend accompanying plaintiff

indicated that she had been averaging one to two headaches per week.

AT 252-54. Dr. Wymer reported that none of plaintiff's multiple

neuroimaging studies had yielded abnormal results.  *Id.*  Dr. Wymer

remarked that during plaintiff's physical examination, she cried "very

inappropriately . . . but never appeared to be in the degree of pain to

explain that."  AT 253.  Dr. Wymer also neurologically examined plaintiff

and noted that she followed both simple and complex commands, but

occasionally needed refocusing.  *Id.*  Dr. Wymer performed a lumbar

---

[8]      Neurontin is a preparation of gabapentin, an anticonvulsant used as adjunctive therapy in the treatment of partial seizures.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 764, 1287 (31st ed. 2007).

[9]      Topamax is a preparation of topiramate, which is used as an anticonvulsant.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1965-1966 (31st ed. 2007).

9

puncture, and the spinal fluid withdrawn though that procedure appeared to be normal.  AT 253-54.  Plaintiff was discharged by Dr. Mahamadu Maida on October 10, 2003, after only "minimal improvement" in her condition.  AT 257-58.  In his discharge summary, Dr. Maida noted a final diagnosis of intractable headache, possibly secondary to migraine headaches, chest pain secondary to costochondritis, obesity, uncontrolled hypertension and left ventricular hypertrophy.  AT 257.

On January 14, 2004, and again on January 31, 2004, Dr. Bhoiwala treated plaintiff for severe headaches as well as complaints of anxiety due to the death of her younger sister.  AT 271-72.   Dr. Bhoiwala saw plaintiff again on February 19, 2004 for a migraine headache, obesity and poor sleeping triggered by the loss of her younger sister.  AT 270.  Dr. Bhoiwala noted that plaintiff had been taking Lortab, Tegretol,[10] Topamax and Wellbutrin.[11]  *Id.*  Dr. Bhoiwala further reported that plaintiff's hypertension was uncontrolled, possibly due to secondary stress, and that she was post-gastric bypass surgery and had lost fifty pounds.  *Id.; see*

---

[10]     Tegretol is a preparation of carbamazepine, an anticonvulsant and antineuralgic used in the treatment of pain associated with trigeminal neuralgia. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1901 (31st ed. 2007).

[11]     Wellbutrin is a preparation of bupropion hydrochloride used, *inter alia*, as an antidepressant.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 265, 2107 (31st ed. 2007).

*also* AT 370.

Plaintiff again presented at the emergency room at Albany Memorial Hospital on March 29, 2004, complaining of a migraine headache and chest pain, attributed by her to recent court appearances, including one earlier that day.  AT 264-66.  Plaintiff denied experiencing any nausea or vomiting, photophobia, fever, or shortness of breath.  *Id.*  The treating physician, Dr. Tracy Sawyer-Nash, diagnosed plaintiff as having a migraine headache, anxiety disorder and a panic attack.  *Id.*

Plaintiff was taken by ambulance to the Albany  Memorial Hospital on March 14, 2005, complaining of severe headache pain and some chest discomfort, AT 283-84.  In his report of the treatment administered on that occasion, Dr. Peter Sosnow noted no weakness, tingling or neurologic or visual deficits, and reported that plaintiff's gait, coordination, musculoskeletal, psychiatric and extremity examinations were normal.  *Id.* Dr. Sosnow diagnosed plaintiff as having an acute exacerbation of a migraine headache and chest pain, but with no evidence to support myocardial ischemia or infarction.  *Id.* Plaintiff was found to be improved and in stable condition at the time of her discharge.  *Id.*

One week later plaintiff again presented to the Albany Memorial

Hospital emergency room with a migraine headache and associated nausea and photophobia, reporting that while she normally experienced a migraine headache on a monthly basis, she had suffered from three migraines over the last month, attributed by her to the stress of making her wedding arrangements.  AT 278-81.  Plaintiff stated that she uses over-the-counter medicines, including Ibuprofen and Tylenol, to treat her headaches though with only marginal success, adding that "'when it gets this bad, I just come to the hospital and you guys give me an IV.' " AT 279. The attending physician who treated her on that occasion noted that plaintiff's gait was normal, ordered a CT scan of her head, which was negative, and diagnosed her as having a migraine headache.  AT 281. Upon her departure, plaintiff's headache was completely resolved, and she left the hospital feeling markedly better than when she had arrived. AT 280-81.

In addition to her migraine headaches, plaintiff has experienced additional physical conditions, including obesity.  Plaintiff underwent gastric by-pass surgery at the Albany Medical Center in January or February of 2004 by Dr. Carl Rosati, resulting in a weight loss from a high of 300 pounds down to 173 pounds.  AT 370.

In addition to the records of her treating sources, the administrative transcript contains reports of multiple consultative physical and mental examinations of plaintiff or her medical records.  Upon referral by the agency Dr. Gowdara Divakara Murthy, of Industrial Medicine Associates, P.C. ("IMA"), performed a consultative neurological examination of plaintiff on May 6, 2003.  AT 200-203.  Dr. Murthy noted that plaintiff complained of periodic headaches and occasional tingling and numbness in her left hand, and that although obese she maintained a normal gait, walked on her heels and toes without difficulty, and squatted fully.  *Id.*  Dr. Murthy also noted full grip strength bilaterally and a normal range of motion in her cervical, thoracic and lumbar spine, and diagnosed plaintiff as suffering from hypertension, depression and a history of cerebral vascular accidents affecting the left side of her body.  *Id.*  Dr. Murthy provided a medical source statement in which he characterized plaintiff's ability to walk, go up and down stairs, squat, push, pull and balance herself as "mildly limited."  AT 203.

Dr. John Thibodeau, also of IMA, performed a consultative psychiatric examination of plaintiff on May 6, 2003, and provided a medical source statement regarding his findings.  AT 204-208.  In his

report, Dr. Thibodeau noted that plaintiff's thought processes were coherent and goal directed, her attention and concentration were mildly impaired, her recent and remote memory skills were mildly impaired, and her insight and judgment were fair.  *Id.*  Dr. Thibodeau opined that plaintiff is able to follow and understand age-appropriate directions and perform simple rote tasks under supervision, but cannot maintain attention and concentration to perform complex or simple tasks based upon her condition.  *Id.*  Dr. Thibodeau further opined that plaintiff would have difficulty learning new tasks due to anxiety and depression, and would not be able to relate adequately with others due to her phobic anxiety.  *Id.*  Dr. Thibodeau concluded that the results of his evaluation were consistent with plaintiff's allegations of a handicapping psychological and psychiatric condition, diagnosing plaintiff as having major depressive disorder, moderate, without psychotic features, and recurrent; low average to borderline intelligence; and status post stroke, status post hysterectomy and hypertension.  AT 207.

On May 19, 2003, Kim Testa completed a physical RFC assessment of plaintiff.[12]  AT 209-214.  In it, Testa found that plaintiff can occasionally

_____

[12]     The record does not indicate whether Testa is a physician.  The regulations limit acceptable medical sources to licensed physicians (medical or

lift and/or carry twenty pounds and frequently lift ten pounds, and is able

to stand and/or walk and sit about six hours in an eight hour work-day and

push and/or pull without restriction.  *Id.*  Testa further concluded that

plaintiff can occasionally climb and balance, and frequently stoop, kneel,

crouch and crawl.  *Id.*  Testa found neither manipulative, visual,

communicative, nor environmental limitations presented by plaintiff's

various conditions   AT 209-214.

Dr. James Alpert, a state agency physician, completed a review of

plaintiff's records on May 20, 2003, opining that plaintiff is moderately

limited with respect to her ability to understand, remember and carry out

detailed instructions.  AT 215-32.  Dr. Alpert further noted his view that

plaintiff is moderately limited in her ability to complete a normal work-

day/week without interruptions as a result of psychologically-based

symptoms, and in her ability to set realistic goals or make plans

independently of others.  AT 215-16.

───────────────────

osteopathic doctors), licensed or certified psychologists and licensed optometrists, for
purposes of establishing visual disorders only, licensed podiatrists, for purposes of
establishing impairment of the foot and ankle only and qualified speech-language
pathologists, for purposes of establishing speech or language impairments only).  *See*
20 C.F.R. § 404.1513(a) and 416.913(a).  Based on the evidence in the record, it is
not clear that Testa qualifies as an acceptable medical source.  Regardless of Testa's
qualifications, the ALJ did not rely on his or her assessment in arriving at his RFC
decision.

Dr. Aaron Satloff responded to interrogatories posed at the ALJ's request on May 27, 2005.  AT 303-08.  Dr. Satloff identified migraine headaches, panic disorder with agoraphobia, major depressive order and class II obesity as plaintiff's medical impairments of concern.  AT 303.  In those responses, Dr. Satloff noted that plaintiff's impairments, either singly or in combination, do not meet or equal any impairment described in the listing of presumptively disabling impairments.  *Id.*  Dr. Satloff additionally reported in his opinion that plaintiff has moderate limitations with respect to her abilities to carry out detailed instructions; to make judgments on simple work-related decisions; to interact appropriately with the public, supervisors and co-workers; and to respond appropriately to work pressures and changes in a routine work setting.   AT 303-08.

At the ALJ's request, on August 19, 2005 Dr. Justin Willer, a neurologist, completed a medical source statement and rendered a medical opinion regarding plaintiff.  AT 295, 336-43.  Dr. Willer evaluated plaintiff's complaints of migraine headaches and noted his opinion that plaintiff's impairments do not meet or equal any of the listed impairments, either singly or in combination.  *Id.*  Dr. Willer explained that the medical reports of record "only raise the possibility that [plaintiff] has migraines"

16

and that the "record never establishes the duration of her headaches."  AT

339.   Dr. Willer similarly noted that the record is "also unclear as to the

frequency of her headaches, and that plaintiff's "frequent use of narcotics

was atypical for a migraine patient" and when combined with "her history

of psychiatric disease raises the possibility that some of her headaches

[were] related to conversion disorder."   AT 340.   The doctor added,

however, that the record does not establish that plaintiff suffers from

conversion disorder.  AT 340.  Dr. Willer found that plaintiff's impairment

does not affect her abilities to lift and/or carry, stand and/or walk, sit and

push and/or pull.  AT 336-37.  He also found that plaintiff can frequently

climb, balance, kneel, crouch and crawl, further finding that her

impairment does not limit her manipulative, visual and communicative

functions and poses no environmental limitations.  AT 337-38.

II.    <u>PROCEDURAL HISTORY</u>

  A.    <u>Proceedings Before The Agency</u>

  Plaintiff filed an application for SSI benefits on or about March 10,

2003, alleging a disability onset date of March 20, 1997.  AT 100-102.

Following the denial of that application on May 21, 2003, AT 29-34, at

plaintiff's request a hearing was conducted on May 4, 2004 before ALJ

Carl E. Stephan to consider plaintiff's application for benefits.  *See* AT 314-362.  Following that hearing, ALJ Stephan issued a determination on June 23, 2004 concluding that plaintiff was not disabled at the relevant times, and thus ineligible for benefits.  AT 46-48.  That determination, however, was vacated on December 14, 2004 by the Social Security Administration Appeals Council, and the matter was remanded to the ALJ for further consideration, including, *inter alia*, to obtain evidence from a vocational expert "to clarify the effect of the assessed limitations on the claimant's occupational base."  AT 69-81.

A second hearing was conducted by ALJ Stephan on November 22, 2005.  AT 363-79.  Testifying at that hearing was the plaintiff, who was represented by counsel, and Peter Manzi, a vocational expert.  *See id.*

Based upon his *de novo* review of the available evidence, on January 10, 2006, ALJ Stephan issued a determination in which he again determined that plaintiff was not disabled, and thus did not qualify for SSI benefits.  AT 21-28.  In his decision, ALJ Stephan applied the now-familiar, five-step sequential test for determining disability.  After concluding at step one that plaintiff had not engaged in substantial gainful activity at any relevant time, ALJ Stephan next proceeded to find that

18

plaintiff's stroke related symptoms, hypertension, depression, obesity and

migraine headaches were sufficiently severe to qualify at step two as

significantly limiting her ability to do basic work activities, but concluded at

step three that they did not, either individually or in combination, meet or

equal any of the listed, presumptively disabling impairments set forth in

the regulations, 20 C.F.R. Pt. 404, Subpt. P., App. 1.  AT 22, 27.

Before proceeding to step four of the disability algorithm, the ALJ

surveyed the available evidence, concluding from it that plaintiff retains

the RFC to perform a

> wide range of light work based upon her ability to
> lift or carry up to ten pounds frequently or twenty
> pounds occasionally to stand or walk for up to six
> hours each day, with only occasional climbing,
> stooping, crouching, crawling, balancing or
> kneeling in a work setting that would allow for
> occasional problems with understanding,
> remembering or carrying out detailed instructions,
> dealing with work stress and dealing with others.

AT 25-27.[13]

---

[13]   By regulation, light work is defined as follows:

> Light work involves lifting no more than 20
> pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very
> little, a job is in this category when it requires
> a good deal of walking or standing, or when it
> involves sitting most of the time with some

After concluding that plaintiff had no past relevant work history of significance ALJ Stephan proceeded to step five of the governing test, appropriately noting the shifting of burdens to the Commissioner to demonstrate the existence of jobs in sufficient numbers in the national economy susceptible of being performed by plaintiff.  AT 26.  ALJ Stephan noted that according to Vocational Expert Manzi a person with plaintiff's attributes, including her RFC, would be capable of performing jobs existing in sufficient numbers in the national and regional economy, including as a laundry sorter, collector operator, and photocopying machine operator.  AT 26-27.  With this testimony, and in reliance upon the medical-vocational guidelines (the "grid") set forth in the regulations, C.F.R. Pt. 404, Subpt. P, App. as a framework, the ALJ determined that a finding of no disability was warranted, and plaintiff therefore does not

---

> pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

qualify for SSI benefits.  AT 26-28.

The ALJ's opinion became a final determination of the agency on

October 26, 2006, when the Appeals Council denied her request for

review of that decision.  AT 4-6.

B.    This Action

Having exhausted her administrative remedies within the agency,

plaintiff commenced this action on December 15, 2006.  Dkt. No. 1.  Issue

was thereafter joined on May 1, 2007 by the Commissioner's filing of an

answer, Dkt. No. 7, preceded by the submission of an administrative

transcript of the evidence and proceedings before the agency.  Dkt. No. 6.

With the filing of plaintiff's brief on June 15, 2007, Dkt. No. 9,  and that on

behalf of the Commissioner on July 30, 2007, Dkt. No. 10, the matter is

now ripe for determination, and has been referred to me for issuance of a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(d).  *See also* FED. R. CIV.

P. 72(b).[14]

---

[14]      This matter has been treated in accordance with the procedures set forth
in General Order No. 18 (formerly, General Order No. 43) which was issued by the
Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998,
and subsequently amended and reissued by Chief District Judge Frederick J. Scullin,
Jr., on September 12, 2003.  Under that General Order an action such as this is
considered procedurally, once issue has been joined, as if cross-motions for judgment
on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil

III.    DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; and significantly deferential that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998), superseded on other grounds by *Figueroa v. Apfel*, 200 U.S. Dist. LEXIS 5759 (S.D.N.Y. April 28, 2000); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless

———————————————

Procedure.

22

of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel,* 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Martone,* 70 F. Supp. 2d at 148 (citing *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards

have been applied and/or that substantial evidence does not support the

agency's determination, the agency's decision should be reversed.  42

U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the

court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning.  *Martone*,

70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and*

*Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand,

while unusual, is appropriate when there is "persuasive proof of disability"

in the record and it would serve no useful purpose to remand the matter

for further proceedings before the agency.  *See Parker*, 626 F.2d at 235;

*see also Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 57 (2d Cir.

1992); *Carroll v. Sec'y of Health and Human Servs*., 705 F.2d 638, 644

(2d Cir. 1983).

     B.    Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

 In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§

404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then

the second step involves an examination of whether the claimant has a

severe impairment or combination of impairments which significantly

25

restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46.  In deciding whether that

26

burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

      C.    <u>The Evidence In This Case</u>

          1.    <u>RFC Determination</u>

While not expressly characterizing the argument in this way, plaintiff appears to challenge the ALJ's RFC determination which led to the finding of no disability.  The Commissioner responds by arguing that the RFC determination is well-supported by the record.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. § 404.1545(a).  An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *Id.*; *Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. §§ 404.1545(b), 404.1569a.  Nonexertional limitations or impairments, including

impairments which result in postural and manipulative limitations, must also be considered.  20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris,* 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997).

The physical elements of the ALJ's RFC finding, to the extent that they are not impacted by plaintiff's migraine headaches and other non-exertional limitations, are well supported by evidence in the record, and plaintiff does not appear to argue otherwise.  Plaintiff's concern appears to center upon the non-exertional component of the RFC finding, arguing that the ALJ's conclusion improperly discounted limitations associated with her migraine headaches and the residual effects of her previous

strokes as well as her anxiety and depression.

     (a) Migraine Headaches

     Undeniably, plaintiff has stated that she experiences frequent and debilitating migraine headaches.  The objective medical evidence, however, fails to substantiate this claim.  While plaintiff complained of headaches on several occasions between May 23, 2003 and March of 2005, they appear to have been precipitated by stressful events in her life. In January and February of 2004, for example, plaintiff reported experiencing headaches following the death of her younger sister.  AT 270-72.  Similarly, on March 29, 2004 plaintiff reported experiencing a headache after a stressful court appearance earlier in the day.  AT 264-65.  The next reported complaint of headaches occurred nearly one year later in March of 2005, when plaintiff reported experiencing stress as a result of an impending marriage.  AT 279-80, 293.  In a report of the March 21, 2005 emergency room visit plaintiff described experiencing monthly headaches generally treated "with marginal success" through such over-the-counter medications as Ibuprofen and Tylenol.  AT 279.

     When questioned by health care providers in March of 2004 concerning her headaches, plaintiff denied experiencing photophobia,

fever, shortness of breath or vomiting.  *See e.g.,* AT 264.  Clinical testing,

moreover, has resulted in normal CT and MRI scans, a negative lumbar

puncture and normal blood results.  AT 253.  Additional neurological

examinations have also been normal.  AT 244, 248.  Based upon his

review of plaintiff's medical records, and in particular her failure to

complain of photophobia, nausea or vomiting, all of which would constitute

objective corroborating evidence of migraines, Dr. Justin Willer, opined

that plaintiff's headaches were not of sufficient duration or frequency to

qualify as migraines.  AT 339-40.

From the record it is clear that the only significant non-exertional

limitation imposed by plaintiff's migraine condition is the requirement that

she avoid undue stress.  This limitation was explicitly acknowledged by

the ALJ in his RFC determination.  *See* AT 25-26.  Bearing in mind that it

was plaintiff's burden to establish her claim by "medically acceptable and

laboratory diagnostic techniques" that she is not only unable to do her

previous work, but cannot, considering her age, education and work

experience, engage in any other gainful work that exists in the national

economy, *Mathews v. Eldridge*, 424 U.S. 319, 336 (1976), I find that this

burden was not carried.  *See also*, *Perez v. Chater*, 77 F.3d 41, 46 (2d

Cir. 1996); *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1988).

(b) Depression and Anxiety

The record also fails to substantiate plaintiff's claim that her depression and anxiety are sufficiently severe to prohibit her from working in a simple, low stress job environment with only occasional interactions with other people.  When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow a special procedure at each level of administrative review.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  The Commissioner first records the pertinent signs, symptoms, findings, functional limitations, and effects of treatments contained in the record.  *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1).  If a mental impairment is determined to exist, the Commissioner must next indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent.  *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2).  In doing so the Commissioner rates the degree of functional loss resulting from the impairment – on a scale ranging from no limitation to severe limitation, the latter of which is incompatible with the ability to do work-like functions – analyzing four specific factors, including 1) activities of daily living; 2) social functioning;

3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings.  *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

The Commissioner must then determine the severity of the mental impairment.  *Id.* §§ 404.1520a(d), 416.920a(d)(2).  Where the Commissioner rates the degree of limitation in the first three functional areas as "none" or "mild", and "none" in the fourth functional area, the Commissioner will generally conclude that claimant's impairment is not severe, unless the evidence indicates otherwise.  *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).  If, on the other hand, the Commissioner finds the claimant's medical impairment to be severe, she must determine whether it meets or equals a listed mental disorder.  *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).  In the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC, considering whether the claimant has a limited ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – that may reduce his or her ability to do past work and

32

other work.  *See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c),

416.920a(d)(3), 416.945(c).

Although it is true that an ALJ has an obligation to develop a full and

fair record – and cannot ignore evidence of a mental impairment if it is

presented – it remains the claimant's initial responsibility to provide proof

of a mental impairment consisting of medical evidence, including signs,

symptoms, and laboratory findings, and not just the claimant's statement

of symptoms, sufficient to indicate the potential existence of a mental

impairment.  *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (citing

20 C.F.R. §§ 404.1508, 404.1514); *Scott v. Callahan*, 977 F. Supp. 856,

868 (N.D. Ill. 1997).

Here, the ALJ's analysis comports with the procedure to be followed

where there is evidence of a mental impairment.  The ALJ discussed

plaintiff's symptoms, treatment and limitations, acknowledging that the

medical evidence shows that plaintiff has suffered from recurrent major

depressive disorder of moderate severity with no psychotic features.  AT

23.  Treatment of plaintiff's depression has been limited to use of

Wellbutrin, prescribed by Dr. Bhoiwala, a physician who she saw only

infrequently.  *See* AT 269-73.  Like her migraines, moreover, plaintiff's

depression appears to be sporadic, and linked directly to periodic stressful events.  This is well-illustrated, for example, by the fact that on March 3, 2003, Dr. Bhoiwala treated plaintiff for depression, anxiety, and insomnia due to her boyfriend having molested her eleven year old daughter.  AT 269.

The ALJ's determination that plaintiff's mental condition did not significantly affect her ability to perform basic work activities, other than as noted in his RFC finding, meets the regulatory requirements, drawing support from plaintiff's medical records as well as other portions of the record.  An RFC assessment prepared by Dr. James Alpert following his review of plaintiff's medical records, for example, reveals only moderate limitations in plaintiff's ability to understand and remember detailed instructions; to carry out detailed instructions; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to set realistic goals or make plans independently of others, discerning no other limitations presented by plaintiff's mental conditions.  AT 215-17.   In reviewing plaintiff's medical records Dr. Alpert noted that plaintiff was "in no form of

mental health treatment."  AT 217.  Plaintiff's unexplained failure to avail

herself of counseling or other psychological/psychiatric treatment could

support an inference that the effects of her mental conditions are not as

great as alleged.[15]  *See Toro v. Chater*, 937 F. Supp. 1083, 1093

(S.D.N.Y. 1996).

Another non-examining psychiatric expert, Dr. Aaron Satloff,

similarly opined that plaintiff's mental conditions present only moderate

limitations in her ability to understand and remember detailed instructions;

to carry out detailed instructions; to interact with the public; to interact

appropriately with supervisors; to respond appropriately to work pressures

in a usual work setting; and to respond appropriately to change in routine

work setting.  AT 307-08.  The ALJ concluded that the clinical evidence

establishes that plaintiff suffers from a severe mental health impairment,

but that the medical evidence does not establish findings sufficient to

meet, or medically equal criteria of any listed impairment.  In addition, ALJ

Stephan found that plaintiff's mental impairments only minimally affect her

_____

[15]   It is true that such an inference could be negated upon a showing, for
example, that the plaintiff's failure to obtain treatment was related to finances.
*McNight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990)(collecting cases).  There is no
evidence in the record, however, to suggest plaintiff's inability to seek out and find
available and affordable mental health treatment for her conditions.

ability to perform work-related functions, imposing "occasional problems

with understanding, remembering or carrying out detailed instructions,

dealing with work stress, and dealing with others."  AT. 26.  The opinions

of Drs. Alpert and Satloff provide substantial evidence supporting these

findings.

### (c) Obesity, Minor Stroke, Hypertension

Although the focus of her challenge to the finding of no disability

appears to be the ALJ's findings with regard to her alleged non-exertional

limitations relating to her migraines and depression, plaintiff continues to

press her claim that she is disabled as a result of obesity, a minor stroke

and hypertension.

When considering whether a claimant's impairment meets or equals

one or more of the conditions listed in the regulations, that person's

obesity and its effects in combination with musculoskeletal impairments

must be considered, in the context of the specifics of the her

circumstances.[16]  *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.00(Q); *see*

*also* SSR 02-1p; *Orr v. Barnhart,* 375 F. Supp. 2d 193, 199 (W.D.N.Y.

---

[16]        Obesity in and of itself was eliminated as a listed disability in October of
1999.  *See* Social Security Ruling 00-3p.  Its description as a potential contributing
factor is now referenced in section 1.00(Q) of the listings.

2005).  As the regulations observe,

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity.  The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(Q).

Undeniably, plaintiff's medical records confirm a history of obesity.  The mere presence of a disease or impairment alone, however, is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations which it may impose upon the ability to perform basic work functions, that is pivotal to the disability inquiry.  *See Rivera v. Harris,* 623 F.2d 212, 215-16 (2d Cir. 1980); *Coleman v. Shalala,* 895 F. Supp. 50, 53 (S.D.N.Y. 1995).  In this instance plaintiff's medical records fail to establish any work-related limitations associated with her obesity.  In addition, according to plaintiff's hearing testimony, in 2004

when she filed her claim, she weighed three hundred pounds.   AT 353.

By the time of the second hearing, however, plaintiff had lost over one

hundred pounds, and her weight was down to one hundred seventy-three

pounds, presumably as a result of the gastric by-pass surgery she

underwent in January or February of 2004.  AT 370.  Upon examination,

Dr. Murthy found that although obese, plaintiff maintained a normal gait,

walked on her heels and toes without difficulty, and squatted fully.  He

also noted full grip strength bilaterally and a normal range of motion in her

cervical, thoracic and lumbar spine.  Other than the noted mild limitations

on her ability to walk, go up and down stairs, squat, push, pull and

balance herself, there is no evidence in the record that plaintiff's obesity

caused exertional, or non-exertional, limitations that would prevent her

from engaging in light work.

    With regard to plaintiff's high blood pressure, "a person is disabled

under § 4.03 of the Listing of Impairments based on hypertension if the

claimant's high blood pressure is accompanied by chronic heart failure as

defined under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02, by ischemic

heart disease (inadequate blood circulation) as defined under 20 C.F.R.

Pt. 404, Subpt. P, App. 1, § 4.04, or under the criteria for a specifically

affected 'body symptom,' including vision, as defined under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 2.02-2.04, renal function, as defined under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.02, or central nervous system, as defined under 20 C.F.R. Pt. 404, Subpt. P, App., 1 § 11.04A or B." *Ianni v. Barnhart*, 403 F.Supp. 2d 239, 253 (W.D.N.Y. 2005).  In this instance, there is no evidence in the record that plaintiff was ever diagnosed with either chronic heart failure or ischemic heart disease, or any problems with his vision, renal function or central nervous system attributed to hypertension.   Nor is there any indication in the record that plaintiff's high blood pressure is not now controlled.  As such, notwithstanding that the ALJ found this condition severe,  plaintiff is not disabled based on hypertension. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.03.  Moreover, there is no evidence in the record that plaintiff's hypertension resulted in any limitations on plaintiff's ability to work

Finally, with regard to plaintiff's alleged minor stroke, while the ALJ credited the evidence in the record and found this condition severe, there is no objective medical evidence in the record to confirm that plaintiff suffered a stroke.  To the extent that plaintiff did suffer a stroke, Dr. Erickson's examination of plaintiff revealed stable vital signs and a CBC

within normal limits, and an EKG showed  left ventricular hypertrophy, mild

left axis deviation and normal intervals.  In addition, Dr. Murthy concluded

that plaintiff's condition related to any strokes is stable and that she has

no neurologic abnormalities.  AT 203.  Again, there is no evidence in the

record that plaintiff has any continuing effects that impair her exertional or

non-exertional activities as they may relate to potential employment.

For these reasons, I conclude that the ALJ's determination that

plaintiff's obesity, hypertension and the effects of a minor stroke were

severe but did not meet or equal one of the listed impairments, and his

consideration of these conditions in assessing plaintiff's RFC, is supported

by substantial evidence.

### 2.   Credibility

Plaintiff also challenges the ALJ's rejection of her testimony

regarding the debilitating effects of her migraine headaches.  The

Commissioner counters the ALJ's credibility determination is well

supported.

It is well within the discretion of the Commissioner to evaluate the

credibility of a plaintiff's complaints and render an independent judgment

in light of the medical findings and other evidence.  *See Mimms v.*

*Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984); Social Security Ruling

("SSR") 96-7p, 1996 WL 374186, Titles II and XVI: Evaluation of

Symptoms in Disability Claims: Assessing the Credibility of an Individual's

Statements (S.S.A. 1996).  "Since symptoms sometimes suggest a

greater severity of impairment than can be shown by objective medical

evidence alone," all information submitted by a claimant concerning his or

her symptoms must be considered.  20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3). The claimant's testimony alone carries independent weight;

to require a claimant to fully substantiate his or her symptoms with

"medical evidence would be both in abrogation of the regulations and

against their stated purpose."  *Matejka v. Barnhart*, 386 F.Supp.2d 198,

207 (W.D.N.Y. 2005) (citing *Castillo v. Apfel*, No. 98 CIV. 0792, 1999 WL

147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

    The regulations prescribe a specific process that the ALJ is obliged

to follow in weighing a claimant's testimony.  The ALJ must first establish

that there is a medically determinable impairment that could reasonably

be expected to produce the claimant's symptoms.  20 C.F.R. §§

404.1529(b), 416.929(b). If the ALJ finds such an impairment, then the

ALJ next evaluates the intensity and persistence of the symptoms to

determine how the symptoms limit the claimant's functioning.  20 C.F.R.

§§ 404.1529(c), 416.929(c).

A claimant's testimony is entitled to considerable weight when it is

consistent with and supported by objective clinical evidence

demonstrating that the claimant has a medical impairment which one

could reasonably anticipate would produce such symptoms.  *Barnett v.*

*Apfel*, 13 F.Supp. at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).

If clinical evidence does not fully support the claimant's testimony

concerning the intensity, persistence, or functional limitations, then the

ALJ must consider additional factors, including: 1) daily activities; 2)

location, duration, frequency, and intensity of any symptoms; 3)

precipitating and aggravating factors; 4) type, dosage, effectiveness, and

side effects of any medications taken to relieve symptoms; 5) other

treatment received; and 6) any other measures taken to relieve

symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3) (i)-(vi).

After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may

accept or reject a claimant's subjective testimony.  *Martone*, 70 F.Supp.2d

at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Although the

ALJ is free to accept or reject such testimony, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61 (citation omitted). Where substantial evidence supports the ALJ's findings, the decision to discount subjective testimony may not be disturbed on court review.  42 U.S.C. § 405(g); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

While the ALJ's recitation of the factors leading him to reject, in part, plaintiff's subjective claims is less than comprehensive, it nonetheless sets forth in summary fashion the basis for his determination, which draws the support of substantial evidence.  At her first hearing, plaintiff testified that she suffered from migraine headaches that lasted up to two days, four times a month.  AT 359.  At her second hearing, however, plaintiff testified that she gets day-long migraine headaches twice a month.  AT 368-69.

The medical evidence in the record is no more consistent or conclusive as to the duration or frequency of plaintiff's headaches.  On January 6, 2003, Dr. Wymer noted that plaintiff reported having as many

43

as twelve migraine headaches per month.  AT 179.  Noting that plaintiff

was unsure of how many headaches she had per month and that it was

difficult for him to obtain her medical history, Dr. Calder offered his best

estimate on May 25, 2003 that she had twelve headaches per month.  AT

237.  In contrast, on May 6, 2003, Dr. Murthy reported that plaintiff's

"current complaints include getting headaches *periodically*."  AT 200

(emphasis added).  Similarly, on October 8, 2003, Dr. Wymer noted that a

friend present with plaintiff at the examination indicated that she had been

averaging one to two headaches per week.  AT 252.  On March 21, 2005,

plaintiff reported that while she normally experiences migraine headaches

on a monthly basis, she had had three migraines over the prior month, a

fact which she attributed to the stress of making her wedding

arrangements.  AT 279.  Moreover, as was noted previously, plaintiff did

not seek treatment for her headaches or depression for nearly a year

between March of 2004 and March of 2005.  Such conservative treatment

may properly be considered when assessing credibility.[17]  *See, e.g.*,

*Harvey v. Astrue*, 2008 WL 4517809, at *13 (N.D.N.Y. Sept. 24, 2008)

---

[17]     Plaintiff additionally has not sought and received continuous treatment
over time for her mental condition, another relevant factor.  *See, e.g.*, *Iuteri v.
Barnhart*, 2004 WL 1660580, at *12 (D. Conn. March 26, 2004).

(Mordue, C.J.).

The ALJ noted that plaintiff lives and travels independently, socializes, manages her own funds and enjoys a variety of activities such as crocheting, knitting and socializing.  AT 25.  Indeed, the record demonstrates that plaintiff has engaged in a wide variety of daily activities, including to raise her several children.  Plaintiff testified that she socializes with her daughter and with her best friend Kim.  AT 356.  Plaintiff has a driver's license and drives frequently, including when transporting her children to school, and to her best friend's residence.  AT 347, 356-57.  Plaintiff testified that she tends to her personal hygiene, cleans her house, watches television, does crossword puzzles and cooks.  AT 357.  Similarly, Ms. Latham noted that she prepares breakfast and dinner for her children, sees her children off to school, goes shopping once a week and completes various chores around the house, including laundry and cleaning, during the day.  AT144.  Plaintiff further identified crocheting, knitting and socializing with her best friend as hobbies and interests she pursues on a daily basis.  AT 141-45, *see also* AT 201.

The ALJ provided a clear and adequate explanation for his decision to discount plaintiff's subjective allegations regarding migraine headache-

related pain and mental problems, including depression, and substantial

evidence exists in the record to support that determination.  After

consideration of his conclusions and the relevant portions of the record, I

conclude that substantial evidence supports the ALJ's determination

regarding plaintiff's credibility.

### 3.   Step Five Determination

In her final argument plaintiff asserts that the ALJ's step five

determination is not supported by substantial evidence.  The focus of this

argument is upon the vocational expert's testimony and plaintiff's

contention that the ALJ did not provide the expert with a full and complete

statement regarding plaintiff's limitations.

It is well-established that elicitation of testimony from a vocational

expert is a proper means of fulfilling the agency's burden at step five of

the disability test to establish the existence of jobs in sufficient numbers in

the national and regional economy that plaintiff is capable of performing.

*Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v.

Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F.

Supp. 2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v.

Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566,

416.966.  Use of hypothetical questions to develop the vocational expert's

testimony is also permitted, provided that the questioning precisely and

comprehensively includes each physical and mental impairment of the

claimant accepted as true by the ALJ.  *Varley v. Sec'y of Health & Human*

*Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  If the factors set forth in the

hypothetical are supported by substantial evidence, then the vocational

expert's testimony may be relied upon by the ALJ in support of a finding of

no disability.  *Id.*

During his testimony Vocational Expert Manzi was asked three

hypothetical questions.  The first posited a younger individual in her

thirties with a ninth grade education and plaintiff's past work history,

capable of performing work at a medium level of exertion though with only

occasional climbing, stooping, crouching, crawling, balancing or kneeling.

AT 375.  The ALJ asked Dr. Manzi to further assume that the individual

has occasional difficulties with understanding, remembering and executing

detailed instructions, coping with work stresses, and dealing with others

so as to limit the individual to simple low stress work with infrequent

contact with co-workers, supervisors or the public.  *Id.*  In response, Dr.

Manzi testified to positions available in sufficient numbers in the national

and regional economy which the hypothetical individual could perform,

including as a laundry worker and a hand packager.  AT 376.  In the

second hypothetical, the only change was in the specified exertional

limitation, with the hypothetical individual being limited to performing work

at the light exertional level.  AT 376.  In response, Dr. Manzi concluded

that the individual could work as a laundry sorter, a collator operator, and

as a photocopying machine operator, and that there was sufficient

numbers of jobs available in each of these categories in the national and

regional economy to support a finding of no disability.  AT 377.  The third

hypothetical asked Dr. Manzi to assume the same individual, subject to a

light exertional level of restriction, but added that the person also has

frequent difficulties with understanding and remembering, executing

detailed instructions, coping with work related stresses and dealing with

others.  AT 377-78.  Dr. Manzi concluded that the person described in the

third hypothetical could not perform any available work in the national or

regional economies.  AT 378.

The second hypothetical posed to the expert approximates plaintiff's

circumstances, as determined by the ALJ.  Since I have already found that

the ALJ's RFC determination is supported by substantial evidence, the

determination at step five concerning the availability of work is well supported.

IV.    SUMMARY AND RECOMMENDATION

In arriving at his determination that plaintiff was not disabled within the meaning of the Act at the relevant times, the ALJ correctly determined that plaintiff's migraine headaches, hypertension, depression, obesity and the effects of a minor stroke were severe impairments but did not meet or equal one of the listed impairments, properly measured plaintiff's RFC, appropriately assessed plaintiff's credibility and, in reliance upon testimony of a vocational expert based upon hypothetical questions closely approximating plaintiff's condition and limitations, properly concluded that there exists in the national and regional economies sufficient jobs in sufficient numbers which plaintiff is capable of performing.  Accordingly, it is hereby

RECOMMENDED that defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability be AFFIRMED, and plaintiff's complaint be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within TEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

       It is hereby ORDERED that the clerk of the court serve a copy of this

Report and Recommendation upon the parties in accordance with this

court's local rules.


Dated:      May 18, 2009
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

50